## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CONNIE L. McDONALD,                       )
                                          )
          Plaintiff,                      )
                                          )
          vs.                             )     Civil Action No. 08-246
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security,          )
                                          )
          Defendant.                      )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Connie L. McDonald and Defendant
Michael J. Astrue, Commissioner of Social Security. Plaintiff
seeks review of final decisions by the Commissioner denying her
claims for disability insurance benefits ("DIB") under Title II of
the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental
security income benefits ("SSI") under Title XVI of the Social
Security Act, 42 U.S.C. §§ 1381 *et seq.* For the reasons discussed
below, Plaintiff's motion is denied and Defendant's motion is
granted.

### II.   BACKGROUND

#### A.    Factual Background

Although Plaintiff Connie L. McDonald did not graduate
from high school, she later earned a GED and worked in a variety of

1

short-term jobs, e.g., driver for a bus company, cook and waitress in a restaurant, and sales associate, beginning in 1997. (Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 5, "Tr.," at 63; 83.) In 2004, she completed training as a nurse assistant and worked in that capacity until May 2004 when she "could no longer be around people" and was terminated due to frequent absences. (Tr. 73; 83; 86.)

In July 2004, Ms. McDonald's daughter was killed in an automobile accident and she began raising her 10-year old grandchild. Her depression and anxiety, for which she had been treated by a general practitioner since at least 1998, was exacerbated by the death. In May 2005, Plaintiff began consulting with Dr. Manoj Lekhwani, a psychiatrist at the Family Counseling Center ("FCC") in Kittanning, Pennsylvania. During the initial interview, Ms. McDonald reported that for approximately nine months, she had experienced increasing depression, crying spells, difficulty sleeping, and faulty memory. (Tr. 135.)

B.    Procedural Background

On August 11, 2005, Plaintiff applied for disability insurance benefits and supplemental security income benefits, claiming disability as of May 3, 2004, due to depression, anxiety, and social phobia.    (Tr. 57-61; 188-194; 82.)    After the applications were denied on November 28, 2005 (Tr. 28-31), Ms. McDonald timely requested a hearing before an Administrative Law

2

Judge ("ALJ.")

On August 29, 2006, a hearing was held before the Honorable Patricia C. Henry at which Plaintiff was represented by counsel. Judge Henry issued her decision on November 22, 2006, again denying DIB and SSI benefits. (Tr. 16-25.) The Social Security Appeals Council declined to review the ALJ's decision on December 20, 2007, finding no reason pursuant to its rules to do so. (Tr. 5-8.) Therefore, the November 22, 2006 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on February 20, 2008, seeking judicial review.

C.    Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g);

3

Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. LEGAL ANALYSIS

### A. The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[1] currently existing in the national economy.[2] The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). To be granted a period of disability and receive disability insurance benefits, a claimant must also show that she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which she was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Ms. McDonald satisfied the first two non-medical requirements, and the parties agree that Plaintiff's date last insured will be December 31, 2009.

---

[1] According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[2] The claimant seeking supplemental security income benefits must also show that her income and financial resources are below a certain level. 42 U.S.C. § 1382(a).

To determine a claimant's rights to either SSI or DIB,[3] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, she cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits her ability to do basic work activity, she is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC") to perform her past relevant work, she is not disabled; and

(5) if, taking into account her RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, she is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support her position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[4]

---

[3] The same test is used to determine disability for purposes of receiving either type of Social Security benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both SSI and DIB programs.

[4] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, citing Bowen v. Yuckert, 482 U.S.

Sykes, 228 F.3d at 263.

Following the prescribed analysis, Judge Henry first concluded that although Ms. McDonald had worked for a brief period after her alleged disability onset date, her small amount of income in 2005 did not meet the statutory definition of substantial gainful activity. (Tr. 18, *citing* 20 C.F.R. §§ 404.1520(b) and 404.1571.)

Resolving step two in Ms. McDonald's favor, the ALJ found that her severe[5] impairments were depression and an anxiety disorder. (Tr. 18-19.) At step three, the ALJ concluded that Plaintiff's impairments, either alone or in combination, did not meet or medically equal the criteria of Listing 12.04 (depressive disorders), Listing 12.06 (anxiety-related disorders), or any of the other impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18.)

At step four, the ALJ concluded Plaintiff had no exertional limitations but, due to her mental impairments, she was

> limited to simple, routine, repetitive tasks not
> performed in a [fast]-paced production environment,

_____

137, 146-147 n.5 (1987).

[5] *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n.5.

7

involving only simple, work-related decisions, and in
general, relative[ly] few work place changes. She is
also limited to occasional interaction with supervisors,
co-workers, and the general public.

(Tr. 19.)

Judge Henry further concluded that although Ms. McDonald had
no exertional limitations which would preclude work involving a
medium level of exertion,[6] Plaintiff's non-exertional limitations
prevented her from performing her past work as a nurse assistant,
sales clerk, bus driver, or waitress which had been described by
the vocational expert ("VE") at the hearing, Frances N. Kinley, as
unskilled or semi-skilled occupations at the light or medium
exertional level. (Tr. 23-24; see also Tr. 225-226.)

In response to the ALJ's hypothetical questions at the
hearing, Ms. Kinley testified there were numerous unskilled jobs
which an individual of Ms. McDonald's education, experience, and
non-exertional limitations could perform in the local or national
economy. She provided the examples of medium and light exertion
jobs such as machine washer, cleaner/housekeeper, laundry/dry
cleaner spotter, and stock clerk. (Tr. 24; see also Tr. 227-228.)

---

[6] According to Social Security regulations, jobs fall into one of
five categories corresponding to the physical exertion needed, i.e.,
sedentary, light, medium, heavy, and very heavy. Medium work requires
the ability to lift and carry no more than 25 pounds frequently or 50
pounds occasionally and to stand or walk, intermittently, for a total
of approximately 6 hours in an 8-hour workday. 20 C.F.R. §§ 416.967
and 404.1567. A person who is capable of performing jobs at the more
strenuous levels is generally assumed to be able to perform jobs in
the categories which require less exertion as well. Id.

8

Based on Plaintiff's status as a younger individual[7] with at least

a high school education, the ability to communicate in English, a

lack of past relevant work, the medical evidence of record, and the

testimony of Plaintiff and the VE, the ALJ determined at step five

that Ms. McDonald was not disabled and, consequently, not entitled

to benefits.  (Tr. 21-22.)

## B.    Plaintiff's Arguments

In her brief in support of the motion for summary

judgment (Docket No. 10, "Plf.'s Brief"), Ms. McDonald raises two

arguments.  First, the ALJ erred by failing to give controlling

weight to the reports of her treating psychiatrist, Dr. Mary S.

Galonski, and relying instead on the opinion of a general

practitioner and on the report of a non-examining state agency

physician.  (Plf.'s Brief at 5-11.)   Second, the Appeals Council

erred by failing to reverse or remand the case on the basis of new

and material medical evidence showing that Ms. McDonald's severe

depression continued unabated despite continued treatment,

medication changes, and dosage adjustments.  (Id. at 11-12.)   Ms.

McDonald seeks reversal of the decision denying her benefits or, in

the alternative, remand for further consideration of her mental

condition.  (Id. at 13.)

---

[7]  Plaintiff was 44 years old on her alleged disability onset
date, making her a "younger" person according to Social Security
regulations.   20 C.F.R. §§ 404.1563(c) and 416.963(c).

9

C. Analysis

We begin our analysis by summarizing the Social Security regulations which describe how medical opinions are to be evaluated.

1. *Proper consideration of medical opinions:* Social Security regulations identify three general categories of medical sources - treating, non-treating, and non-examining. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, e.g., a one-time consultative examiner. Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. 20 C.F.R. §§ 404.1502 and 416.902.

The regulations also carefully set out the manner in which opinions from the various medical sources will be evaluated. 20 C.F.R. §§ 404.1527 and 416.927. In general, every medical opinion received is considered. Unless a treating physician's opinion is given "controlling weight," the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating

10

sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) Id.; *see also* Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994) ("greater weight should be given to the findings of a treating physician than to a physician who has examined the claimant as a consultant" and the least weight given to opinions of non-examining physicians.) The opinions of a treating source are given controlling weight on questions of the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 416.927(c) and 404.1527(d)(2).

2. *Medical evidence:* We turn to a summary of the medical evidence concerning Plaintiff's mental impairments.

a. Dr. Terence Moore: Plaintiff testified that she was first treated for depression in 2000 (Tr. 214),[8] but her medical records start only in 2004. Dr. Terence Moore, a general

---

[8] Plaintiff advised Dr. Lekhmani that she had been treated for depression as early as 1998. (Tr. 135.)

practitioner,[9] treated Ms. McDonald for a variety of minor illnesses (colds, gastrointestinal disorders, neck pain) and prescribed Ativan, lorazepam, and Zoloft[10] for depression and anxiety. (Tr. 108-110.) In February 2005, Ms. McDonald reported she was experiencing increased headaches, was crying, feeling tired all the time, and was "very depressed;" despite these symptoms, she was having trouble getting an appointment at the Family Counseling Center. (Tr. 109.) On October 21, 2005, in a report to the Pennsylvania Bureau of Disability Determination, Dr. Moore noted,

This patient is asking for disability. The patient has been treated by me in the past for anxiety, coughs and colds. I have no idea why she wants disability or feels that she warrants it.

(Tr. 106.) In a follow-up note to the same agency on July 15, 2006, Dr. Moore stated,

Physically, [Ms. Mcdonald] is fit. However, she is on Zoloft, Lorazepam and Seroquel [a sleep aid] which she gets from a psychiatrist. Perhaps, she is thinking that she has some claim on disability by being on multiple

---

[9] At the hearing, Plaintiff testified her primary care physician at the time was a Dr. Mercurio (Tr. 211-212), but no records from this physician appear in the record. Plaintiff does not object to this omission and we conclude it is irrelevant because she is not alleging any physical (i.e., exertional) limitations.

[10] Ativan, a brand name for lorazepam, is used to relieve anxiety; Zoloft (sertraline) is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder. Sertraline is one of several antidepressants called selective serotonin re-uptake inhibitors which work by increasing the amounts of serotonin, a natural substance in the brain that helps maintain mental balance. *See* drugs and supplements entries at the National Institute of Medicine's on-line website, Medline Plus, www.nlm.nih.gov/medlineplus (last visited October 24, 2008), "Medline Plus."

12

medications. I would consult with her psychiatrist, but she does seem to me to be somebody who would be able to work.

(Tr. 164.)

b. <u>Treatment at Family Counseling Center and Plaintiff's hospitalization</u>: When Plaintiff began treating with Dr. Lekhwani in May 2005, her chief complaint stemmed from the death of her daughter in July 2004, after which she was unable to return to her previous level of functioning. Ms. McDonald reported a lack of motivation or any interests, feeling guilty about her granddaughter, and feeling down, tired, and withdrawn. She had difficulty leaving her house without crying, falling asleep or staying asleep, and being able to remember. She denied psychotic or manic symptoms as well as suicidal or homicidal ideation. Her mental status examination was unremarkable except for difficulty remembering things, tearful behavior during the interview, and her reports of depression. Dr. Lekhwani diagnosed her with recurrent moderate major depressive disorder, bereavement, and anxiety disorder not otherwise specified. Her Global Assessment of Functioning ("GAF") score at the time was 55.[11] The treatment

---

[11] The GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. <u>Drejka v. Barnhart</u>, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n2 (D. Del. Apr. 18, 2002). A GAF score between 51 and 60 reflects "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social [or] occupational. . . functioning (e.g., few friends, conflicts with peers or co-workers)." See the on-line version of DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV"), Multiaxial Assessment,

planned was a combination of psychotherapy (which she had apparently already begun) and pharmacotherapy consisting of Zoloft and Trazodone.[12]   (Tr. 135-137.)

Dr. Lekhwani continued to see Ms. McDonald on a monthly basis from May 2005 through May 2006. During that period, several adjustments were made in her medications; her psychotherapy was initially marked by numerous missed appointments. (Tr. 122-132.) About half-way through the period, on November 10, 2005, the psychiatrist noted that she was "doing better on Zoloft (200 mg)" and sleeping well with Seroquel. Although she was feeling stressed about the upcoming holidays, her continuing depression was described as mild and she had no suicidal ideation. He indicated there had been no change in her diagnoses or her GAF. (Tr. 122.)

In December 2005, Ms. McDonald reported to Dr. Lekhwani that her depressive symptoms were significantly improved, as were her sleep and appetite. Shortly before her deceased daughter's birthday in mid-February, she reported increased depression, but a formal treatment plan done on March 6, 2006, indicated her

American Psychiatric Association (2002), at www.lexis.com., last visited October 22, 2008. Neither Social Security regulations nor case law requires an ALJ to determine a claimant's disability based solely on her GAF score. See Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

[12]   Trazodone is a serotonin modulator which treats depression by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. See drugs and supplements entry at Medline Plus.

14

depression at that point was moderate; her GAF continued to be 55. She had become "somewhat more compliant" with her therapy appointments, but had made little progress since the last treatment plan. On the other hand, "her depression [had] not worsened despite numerous psychosocial stressors." (Tr. 157.) By late March, her depression was better and although she was "doing alright" with her current medications, Dr. Lekhwani suggested that she participate in the "partial" program.[13] However, at the time of Dr. Lekhwani's last note on May 26, 2006, she was still waiting for a vacancy in the program. (Tr. 156-163.)

There appears to be a brief hiatus in Plaintiff's medical records until August 1, 2006, when Dr. Mary S. Galonski noted in a telephone contact report[14] that Ms. McDonald was feeling "a little worked up" and angry at an unidentified person. She had previously promised that she would not "get a pistol" and had kept that promise. Dr. Galonski advised her to go the hospital or an emergency room if she thought she was going to harm herself or others. (Tr. 179.) On August 4, 2006, Ms. McDonald reported she still felt angry and had "snapped at" her attorney that day. She was trying to help a friend by babysitting and denied any urge to

---

[13] At the hearing, Plaintiff described the "partial hospitalization" program as "like a group, and you sit in the group and talk about how your week was," i.e., group counseling. (Tr. 211.)

[14] All of Dr. Galonski's notes are based on telephone contacts except those dated August 2, August 28, and October 16, 2006. (Tr. 176, 174, and 200, respectively.)

15

hurt herself. (Tr.171.)

On August 10, Plaintiff reported to Dr. Galonski that she was worked up over a neighbor who did "petty things" and felt as if she were on her "last nerve." She was afraid she would be evicted from her apartment after she choked her son's girlfriend. Ms. McDonald agreed to admit herself to the psychiatric ward of the Armstrong County Memorial Hospital the following Monday after she had made arrangements for care of her granddaughter. (Tr. 170.)

As planned, Ms. McDonald did admit herself to the hospital on August 14, 2006. On admission, the medical staff had intended to begin a program of gradually changing her medications, but she immediately signed a 72-hour notice of release, stating she had to take care of her granddaughter. Although she expressed suicidal thoughts and homicidal thoughts regarding her former son-in-law, she stated she would not act upon them because of the consequences for her granddaughter. Despite encouragement from hospital staff and Dr. Galonski (Tr. 166-167) to remain at the hospital for a longer period of time, Ms. McDonald was discharged against medical advice on August 17, 2006. At the time her diagnoses were recurring severe major depressive disorder, unresolved bereavement, rule out bipolar disorder most recent episode depressed, and rule out alcohol and marijuana abuse. Her psychosocial stressors were

16

considered severe and her GAF upon discharge was 45,[15] although she was also considered neuropsychiatrically and medically stable at the time. (Tr. 183-184.)

In late August, Dr. Galonski noted that Ms. McDonald had experienced "some improvement since discharge but still has mood fluctuations and much grief and is still very tenuous." (Tr. 165.) She also indicated her condition was mildly improved and her GAF had increased from 45 to 50, indicative of moderate depressive symptoms. (Tr. 174.) On August 31, 2006, Dr. Galonski wrote a general letter stating she strongly believed Ms. McDonald had a long-standing problem with recurrent depression and could possibly be diagnosed as bipolar. Plaintiff was described as "in a very severe episode" of depression at the time. Dr. Galonski also reported Ms. McDonald's past history of treatment and her symptoms, including anxiety when around other people, extreme irritability, suicidal and homicidal ideation, physical aggression, and extreme frustration with others. She concluded:

> Her condition is still very tenuous. I in no way feel that she would be able to maintain any kind of employment situation. It is very difficult for her to even maintain brief group interventions at [group counseling]. I do think that her condition warrants disability benefits and would appreciate your consideration in this matter.

(Tr. 185.)

---

[15] A GAF between 41 and 50 is indicative of "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See* on-line version of DSM-IV, Multiaxial Assessment.

17

c.  Evidence from non-examining physicians:  On
November 11, 2005, a state-agency physician completed a Residual
Functional Capacity Assessment-Mental and a Psychiatric Review
Technique Form.  (Tr. 138-153.)  Based on the medical file compiled
to date, he concluded Ms. McDonald had no significant limitations
in her capacity to understand and remember except a moderate
limitation with regard to detailed instructions.  Similarly, her
ability to maintain concentration and carry out instructions was
moderately limited when the instructions were detailed and she
would have some limitations in her ability to complete a normal
workday and workweek without interruptions from psychologically
based symptoms; otherwise, she had no significant limitations in
these  work-related  functions.  Her  abilities  to  interact
appropriately with the general public, to accept criticism from and
respond appropriately to supervisors, to adapt to changes in the
workplace, and to set realistic goals or make plans independently
of others were moderately limited, but she had no other significant
limitations in her social interactions or adaptive behaviors.  The
physician concluded that based on the facts that (1) Plaintiff's
activities of daily living were adequate, (2) her medical record
showed a pattern of improvement while under physicians' care, and
(3) further evidence showed she retained the ability to manage the
demands of many jobs not requiring complicated tasks, Ms. McDonald
could "meet the basic mental demands of competitive work on a

18

sustained basis despite the limitations resulting from her impairment." (Tr. 138-140.)

In the Psychiatric Review Form, Plaintiff's impairments were analyzed under Listing 12.04 (affective disorders) and 12.06 (anxiety related disorders.) The examiner concluded Ms. McDonald demonstrated only mild restrictions in her activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and had not experienced repeated episodes of decompensation, each of extended duration. Nor was there any evidence that her condition was so marginal that even a minimal increase in mental demands or change in the environment would be expected to cause decompensation, or a current history of the inability to function outside a highly supportive living arrangement. (Tr. 141-153.)

3. *Plaintiff's argument regarding the ALJ's analysis of the medical evidence:* As noted above, Plaintiff's primary argument is that Judge Henry erred as a matter of law or abused her discretion when she failed to give controlling weight to the opinions of Dr. Galonski, her treating psychologist, and instead relied on the reports of non-treating, non-examining state agency physicians and on the opinion of Dr. Moore, a general practitioner. (Plf.'s Brief at 5-10.) As a corollary to this argument, she further asserts that had the ALJ adopted Dr. Galonski's opinion, she would have found Ms. McDonald had marked impairments in social

19

functioning and in memory, concentration, persistence and pace, that is, she would have satisfied Listing 12.04.[16]

In her analysis, Judge Henry carefully summarized:

- Plaintiff's testimony about her activities of daily living, social functioning, concentration, persistence or pace, her work history, and medical treatment (Tr. 19, 21, 22, 23);

- Dr. Lekhwani's medical evidence from May 3, 2005 through November 10, 2005, and December 2, 2005 through May 26, 2006 (Tr. 19-20, 21, 22, 23);

- Dr. Moore's October 21, 2005 and July 15, 2006 reports in which he expressed his opinion that Ms. McDonald was employable despite her mental impairments (Tr. 20, 23);

- The medical records regarding Plaintiff's voluntary 3-day

---

[16] Listing 12.04 sets out three categories which measure the severity and effects of the claimant's mental disorders, commonly referred to as the A, B, and C criteria. The A criteria require a definitive medical diagnosis of one of the depressive disorders. To satisfy the B criteria, the claimant's mental impairment must be of such severity that it results in at least two of the following: "marked," i.e., "more than moderate but less than extreme," restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. To satisfy the C criteria, the claimant must present medical evidence that her mental impairment has lasted at least two years and has resulted in "more than a minimal limitation of ability to do basic work activities;" that the symptoms or signs of the disorder are currently attenuated by medication or psychosocial support; and either (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process resulting in such marginal adjustment that even minimal increases in mental demands or changes in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement and an indication of the continued need for such an arrangement. To meet Listing 12.04, the claimant must satisfy the A criteria plus two of the four B criteria, or, alternatively, satisfy the C criteria. Because the Court concludes the ALJ did not err in rejecting Dr. Galonski's opinion in favor of other substantial evidence, we do not address Plaintiff's argument that her condition satisfied two of the four B criteria.

hospitalization in August 2006 (Tr. 20, 21, 22, 23);

- The November 22, 2005 file review by the state-agency consultant (Tr. 20, 23);

- Dr. Galonski's summary letter of August 31, 2006, in which she opined that Plaintiff could not maintain an employment situation based on her difficulties in brief group interactions in psychotherapy, but failed to explain what those "difficulties" might be (Tr. 20-21, 23); and

- Other reports by Dr. Galonski for the period August 1, 2006 through August 31, 2006 (Tr. 21, 22, 23).

Having summarized all the medical evidence in detail, the ALJ concluded that although Ms. McDonald's impairments could reasonably be expected to produce the alleged symptoms, in light of the fact that she continued to function appropriately, had been generally stable on medication, and demonstrated competency in her activities of daily living, Plaintiff's statements regarding the intensity, persistence and limiting effects were not entirely credible. (Tr. 23.) She explicitly noted a number of factors which supported her conclusion, i.e.,

- The opinions by Dr. Moore and the state agency physician that despite her impairments, Ms. McDonald was able to meet the basic mental demands of competitive work on a sustained basis;

- Inconsistencies between the medical evidence and Plaintiff's testimony regarding compliance with her medication regimes as prescribed, the duration and severity of her depression, her activities of daily living, and the inability to leave her home; and

- Plaintiff's questionable use of alcohol and marijuana for self-medication.

(Tr. 23.)

21

Judge Henry concluded that as for Dr. Galonski's opinion evidence in the letter dated August 31, 2006, "it is not consistent with the other creditable evidence of record and appears to [be] based on one episode with emphasis on claimant reports rather than objective clinical tests." (Tr. 23.)

The question before this Court is whether the ALJ's decision was based on substantial evidence; where there is such evidence, this Court may not set aside that decision even if we would have come to a different conclusion. Davis v. Comm'r of Soc. Sec., No. 06-2838, 2008 U.S. App. LEXIS 17210, *6-*7(3d Cir. July 18, 2007), *citing* Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); *see also* Parsons v. Barnhart, No. 03-4141, 2004 U.S. App. LEXIS 10374, *3 (3d Cir. May 26, 004) ("Inherent in [the court's] deferential standard of review is the rule that even if there is contrary evidence in the record that would justify the opposite conclusion, the ALJ's decision will be upheld if it is also supported by the evidence"); and Reefer v. Barnhart, 326 F.3d 376, 379 (3rd Cir. 2003). Here, Judge Henry summarized all the relevant medical evidence in the record, specifically identified the evidence on which she relied in arriving at her conclusion, and explained why she did not give controlling or even great weight to Dr. Galonski's opinion. We conclude the ALJ did not err in her determination, based on substantial evidence, that Plaintiff was not disabled at any time between May 3, 2004, and November 22, 2006.

4. *Plaintiff's argument regarding the Appeals Council's failure to reverse or remand:* Plaintiff argues that Dr. Galonski's notes for the period September 5 through October 16, 2006[17] clearly indicated there had not been significant improvement in her severe depression following her hospitalization despite changes in her medication and on-going psychotherapy. Based on this new and material evidence, the Appeals Council should have reversed the ALJ's denial or, at the very least, remanded her case for further consideration. (Plf.'s Brief at 11-12, *citing* Tr. 200-203.)

In treatment notes from a telephone conversation with Dr. Galonski on September 5, 2006, about two weeks after her hospitalization, Plaintiff reported that "things [were] going pretty good." She was not suicidal and her only medical needs were to see an ear specialist and an eye doctor. (Tr. 203.) At a check-up on September 25, 2006, Plaintiff reported she had been physically ill for two weeks, but was otherwise "doing okay," was not suicidal or homicidal, was taking her granddaughter for walks, was sleeping a lot, and trying to keep out of "everyone else's business." Dr. Galonski found her "less edgy" and considered she had made mild improvement although her insight and judgment were still poor; she rated Plaintiff's GAF at 50. (Tr. 202.) Plaintiff

---

[17] The record shows that the Appeals Council also received records from FCC for the period December 6, 2006, through March 16, 2007. (Tr. 6.) This evidence does not appear in the administrative transcript. However, these records would not have been properly considered pursuant to 20 C.F.R. § 404.970(b) since they relate to the period following the ALJ's decision.

23

was unable to keep her scheduled appointment on October 9, but reported she was not taking any medication except Ativan. She felt better and was able to get out with her granddaughter. She had not used any alcohol since August and no marijuana for the last month. The plan was for her to follow up with an individual therapist rather than in group counseling. (Tr. 201.) In the final notes from October 16, 2006, Dr. Galonski reiterated that Ms. McDonald was taking only Ativan, her insight and judgment were fair, her mood "ok" and her affect pleasant. She was to continue with the same medication and psychotherapy. (Tr. 200.)

When a Social Security plaintiff asks the district court to remand an agency determination for further consideration on the basis of evidence which was not before the ALJ, the plaintiff must satisfy four factors:

> the evidence must be new and not merely cumulative of what is already in the record;
>
> the evidence must be material, relevant and probative;
>
> there must exist a reasonable probability that the new evidence would have caused the Commissioner to reach a different conclusion; and
>
> the claimant must show good cause as to why the evidence was not incorporated into the earlier administrative record.

See Scatorchia v. Comm'r of Soc. Sec., No. 04-2636, 2005 U.S. App. LEXIS 11488, *11 (3d Cir. June 15, 2005), citing 42 U.S.C. § 405(g) and Newhouse v. Heckler, 753 F.2d 283, 287 (3d Cir. 1985).

Plaintiff makes no arguments regarding any of these factors.[18] We conclude that, at a minimum, there is no reasonable probability the Commissioner would have reached a different decision, given that the evidence in question showed Plaintiff was doing "pretty good" or "okay," i.e., she had made "mild improvement" over her condition during her hospitalization; she reported no suicidal tendencies; was physically active; and, perhaps most significantly, was taking far less medication than she had immediately prior to her voluntary commitment. We conclude the Appeals Council did not err in declining to reverse the ALJ's decision or remand for further consideration based on this evidence. *See* Scatorchia, id. at *12 (declining to remand where the Court concluded the evidence would not have changed the Commissioner's decision.)

Having considered each of Plaintiff's arguments, we find them unpersuasive. Summary judgment is granted in favor of Defendant. An appropriate order follows.

October ___29___, 2008

William L. Standish
William L. Standish
United States District Judge

---

[18] Defendant contends that Plaintiff's argument has no merit because the evidence does not relate to the period "on or before the date of" the ALJ's hearing decision, i.e., November 22, 2006. (Defendant's Brief in Support of Motion for Summary Judgment, Docket No. 12, at 13, *citing* 20 C.F.R. § 404.970(b).) Since the evidence submitted pertained to the period September 5 through October 16, 2006, i.e., the two months prior to the ALJ's hearing decision, we cannot agree that this reason is sufficient to disregard the evidence.

25